**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LMCHH PCP LLC, *at el.*,[1] | Case No. 17-10201 (LSS) <br> (Joint Administration Requested) |
| Debtors. | **Related to Dkt. No. 8** |

**LIMITED OBJECTION TO MOTION FOR ORDERS (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (II) AUTHORIZING DEBTOR TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362(d), 363(b), 364(c)(1), 364(c)(2), 364(c)(3), AND 364(e) AND (B) APPLY CASH COLLATERAL TO PREPETITION SECURED CLAIM OF DIP LENDER PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 363(c)(2)(A) AND (III) SCHEDULING FINAL HEARING**

MidCap Funding IV Trust (formerly known as MidCap Funding IV, LLC), the successor-by-assignment to MidCap Financial Trust (formerly known as MidCap Financial, LLC) ("***MidCap***"), by and through its undersigned counsel, files this limited objection to the *Motion for Orders (I) Authorizing Debtors to Use Cash Collateral, (II) Authorizing Debtor to (A) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), 364(c)(1), 364(c)(2), 364(c)(3) and 364(e) and (B) Apply Cash Collateral to Prepetition Secured Claim of DIP Lender Pursuant to 11 U.S.C. §§ 363(b)(1) and 363(c)(2)(A) and (III) Scheduling Final Hearing* (the "***Motion***") and, in opposition to the Motion, MidCap respectfully states as follows:

### INTRODUCTION

1. MidCap is the Debtors' pre-petition working capital lender. Just days prior to the Petition Date, and without advising MidCap that they would be filing for bankruptcy, Debtors drew down all of the availability under the Revolving Loan (defined below). As of the Petition Date, the outstanding balance owed on the Revolving Loan was approximately $6.2 million.

---

[1] The debtors in this case are LMCHH PCP LLC ("***LMCHH***") and Louisiana Medical Center and Heart Hospital, LLC (the "***Hospital***" and together with LMCHH, the "***Debtors***").

4846-5363-6161.6
87574604.2

MidCap has a first lien and security interest in, among other things, Debtors' accounts receivable and the cash proceeds thereof.

2.   MidCap does not object to the request for post-petition financing;[2] however, MidCap objects to the use of MidCap's cash collateral as proposed in the Motion. The adequate protection proposed by Debtors is not, in fact, adequate to protect MidCap's interests in the cash collateral the Debtors intend to use.

3.   As proposed, the Debtors intend to use nearly Fifteen Million Dollars ($15,000,000) of MidCap's cash collateral in the first thirteen weeks of this case and another approximate $1.7 million in the second 13 weeks.

4.   As adequate protection, the Debtors propose to grant MidCap replacement liens on the accounts receivable they generate post-petition, and to pay MidCap 25% of all accounts receivable collected post-petition, which MidCap will apply to principal and interest on its prepetition debt. However, the proposed replacement liens and payments to MidCap will not adequately protect MidCap's interests in the cash collateral that Debtors will use.

5.   Debtors are in a wind-down mode, as they clearly state in their First Day pleadings and the supporting Declaration of Neil F. Luria, Chief Restructuring Officer. As part of the wind down, Debtors are terminating all prepetition contracts with their physicians and offering, in return, for any physician who is interested to sign a temporary post-petition contract that will terminate once the Hospital ceases operations in the next 13 to 26 weeks (if not sooner).

6.   With the Debtors winding down their operations, they will not generate new post-petition accounts receivable at the same pace by which they will be using MidCap's cash

---

[2] MidCap is not objecting to the DIP Loan based on the statements in the Motion and by Debtors' counsel that the Liens being granted to secure the DIP Loan will be subordinate to MidCap's pre-petition liens and security interests, as well the liens granted post-petition to MidCap as adequate protection for use of its cash collateral, and that the term "Permitted Senior Liens" will include all such liens granted by this Court in the Interim Order and Final Order in favor of MidCap.

collateral. Thus, the granting of the replacement liens, while appropriate and necessary, is illusory in terms of providing any real adequate protection to MidCap. And the 25% payments to MidCap do not bridge the gap, inasmuch as they simply amount to MidCap receiving only 25% of its cash collateral, while 75% of MidCap's cash collateral is being used and not being replenished.

7.     The Debtors' proposed Budget proves this point. Assuming for purposes of argument that the Budget is a realistic estimate of collections and expenses, at the end of the first 13 weeks of the wind-down, the Debtors will have collected approximately $15 million of MidCap's cash collateral; however, they will have paid MidCap only 25% of that amount and MidCap will still be owed at least $3.1 million, which is approximately half of what MidCap is owed as of the Petition Date. By week 13, projected weekly cash receipts will have dwindled from a high of $2.2 million in week 3 to a low of $315,000 in week 13. This decline will continue through week 26, whereby projected weekly receipts will be at a high of $258,000 in week 14 and will have dwindled to $91,000 by week 26. At the end of week 26, MidCap will still be owed $2.7 million based on Debtors' projections, with little or no accounts receivable or cash collateral remaining to pay MidCap. Moreover, all of this assumes the Debtors are actually able to generate and collect post-petition revenues while in a wind-down mode. MidCap is dubious about the projections and doubts they will be met, which will result in MidCap being owed even more at the end of the first 13 weeks and 26 weeks, respectively, without any accounts receivable or cash available to pay MidCap.

8.     Debtor's position appears to be that MidCap will nevertheless be adequately protected because of its lien on the Hospital building, which was granted as additional security for the Revolving Loan. However, there is no evidence presented in the Motion regarding the

value of the Hospital, which will be shuttered sometime between now and the end of the Debtors' 26-week wind down.  Moreover, there is no indication as to when or how that asset will be liquidated to pay MidCap what it is owed.  The fact that the Debtors were unable to sell the Hospital prepetition for any amount while it was a going concern casts a long, dark shadow over their ability to sell it once it is shuttered.

9.    Relying on the undetermined value of an illiquid, empty Hospital building in St. Tammany Parish, Louisiana does not adequately protect MidCap's interest in the cash collateral that will be depleted by Debtors and never replaced.  Debtors' proposed treatment of MidCap seeks to transfer the risk of successfully valuing and liquidating the empty Hospital building, which Debtors were unable to sell pre-petition as a going concern, from its other pre-petition lenders and the proposed DIP Lender (who are also, for all intents and purposes, its equity owners), to MidCap.

10.   In short, the proposed adequate protection for the use of MidCap's cash collateral is wholly inadequate.

11.   As a result of the foregoing, and for the reasons discussed in more detail below, this court should deny the Debtors' request to use MidCap's cash collateral.

## **LENDING BACKGROUND**

12.   On or about November 25, 2014, MidCap agreed to extend a revolving loan to the Debtors (the "***Revolving Loan***").

13.   To evidence the Revolving Loan, each of the Debtors executed and delivered to MidCap that certain Revolving Loan Note, dated as of November 25, 2014, in the original principal amount of up to Twelve Million Dollars ($12,000,000) (the "***Note***").

14.   To further evidence the Revolving Loan and secure the obligations of each of the Debtors under the Note and related documents, each of the Debtors executed and delivered to

MidCap that certain Credit and Security Agreement, dated as of November 25, 2014 (the "*Credit Agreement*").

16. Pursuant to the Credit Agreement, the Debtors granted to MidCap first priority liens on and security interests in:[3]

> a. all goods, Accounts (including health-care insurance receivables), unencumbered Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located;
>
> b. all of [Debtors'] books and records relating to any of the foregoing; and
>
> c. any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing;
>
> Provided, however, that the [foregoing] shall not include any of the [Debtors'] (i) furniture, (ii) fixtures, or (ii) Equipment which is subject to a prior Permitted Lien.

16. To further secure the Debtors' obligations under the Note and Credit Agreement, the Hospital executed and delivered to MidCap that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of November 25, 2014 (the "*Mortgage*"), pursuant to which Debtors granted MidCap a first lien on the Debtors' land, improvements, fixtures, and rents that comprise its hospital building, all as set forth more particularly in the Mortgage.

17. To perfect its security interests and liens, UCC-1 Financing Statements were properly filed with respect to LMCHH, on November 21, 2014, with the Delaware Department of State (initial filing number 2014 4717476), and with respect to the Hospital, on November 24,

---

[3] Capitalized terms used in the following quotation shall have the meanings ascribed to them in the Credit Agreement.

2014, with the North Carolina Secretary of State as file number 20140109640J, and on December 1, 2014, with the St. Tammany Parish Clerk of Court as instrument number 1963901 (collectively, the "***Financing Statements***"). The Mortgage was also recorded with the St. Tammany Parish Clerk of Court on December 1, 2014 as instrument number 1963886.

18. In addition to the foregoing, MidCap, the Debtors, and Bank of America, N.A. entered into that certain (a) Governmental Receivables Account Agreement, dated as of November 26, 2014, (b) Deposit Account Control Agreement, dated as of November 26, 2014 (Account—Without Activation), and (c) Deposit Account Control Agreement, dated as of November 26, 2014 (Account—With Activation) (collectively, the "***DACAs***" and together with the Note, Credit Agreement, Mortgage, Financing Statements, and all other documents relating to the Loan, the "***Loan Documents***").[4]

19. Pursuant to the Loan Documents, MidCap has properly perfected, first-priority liens on and security interests in substantially all of the Debtors' assets, including the Debtors' accounts and the cash proceeds, *i.e.*, cash collateral. (Dkt. No. 8, ¶ 25; Dkt. No. 9, ¶ 31.)

**PROCEDURAL BACKGROUND**

20. On January 30, 2017 (the "***Petition Date***"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

21. On January 31, 2017, the Debtors filed the Motion seeking, among other things, the use of MidCap's cash collateral, pursuant to sections 363(c) of the Bankruptcy Code, and authority to provide MidCap adequate protection for the use of MidCap's cash collateral, pursuant to sections 361 of the Bankruptcy Code.

---

[4] True and correct copies of the Loan Documents are not attached to this objection because they are voluminous in nature; however, true and correct copies may be obtained from MidCap's counsel upon request.

22. More specifically, in the Motion, the Debtors request authority to use nearly Fifteen Million Dollars ($15,000,000) of MidCap's cash collateral in the first thirteen (13) weeks of this case. (Dkt. 8, at 104 (Total Cash Receipts).)[5]

23. In exchange, the Debtors propose to: (a) pay to MidCap twenty-five percent (25%) of MidCap's cash collateral; and (b) provide MidCap with replacement liens in accounts generated after the Petition Date in an unspecified amount.

24. The Debtors further assert (without support) that MidCap's other collateral, in conjunction with the foregoing, provides MidCap with adequate protection.

25. For the reasons set forth below, MidCap objects to the relief sought in the Motion because the Debtors' proposal fails to provide MidCap with adequate protection.

## LIMITED OBJECTION

26. The Debtors' request to use MidCap's cash collateral must be denied, because (a) MidCap does not consent to the use of its cash collateral and (b) the Debtors have not proposed (and cannot propose) to adequately protect MidCap's interests in MidCap's cash collateral.

27. Pursuant to section 363(c)(2) of the Bankruptcy Code:

> The [Debtors] may not use, sell, or lease cash collateral under [section 363(c)(1)] unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

---

[5] Out of this amount, the Debtors propose to pay to MidCap approximately $3.15 million.

28.     In turn, section 363(e) of the Bankruptcy Code provides, in pertinent part:

> [O]n request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the [Debtors], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

29.     Importantly, in seeking to use cash collateral under section 363 of the Bankruptcy Code, the Debtors have the burden of proof on the issue of adequate protection. 11 U.S.C. § 363(p)(1).

**I.   The Motion should be denied because: (a) other collateral does not adequately protect MidCap's interests in cash collateral; and (b) the adequate protection payments and replacement liens are inadequate.**

30.     The Debtors' proposal fails to recognize Midcap has at least two distinct security interests, each of which must be adequate protected.

31.     Moreover, the adequate protection payments and replacement liens are entirely insufficient to protect MidCap's interests in cash collateral.

   **(a).   Other collateral does not adequately protect MidCap's interests in cash collateral.**

32.     As set forth above, MidCap has (at least) two distinct security interests: (a) security interests in other collateral; and (b) security interests in cash collateral—*e.g.*, accounts receivable and the proceeds of accounts receivable—which include security interests in postpetition cash collateral, pursuant to section 552(b) of the Bankruptcy Code.

33.     Each of MidCap's security interests must be adequately protected. *E.g.*, *In re Shivshankar P'ship LLC*, 517 B.R. 812, 826 (Bankr. E.D. Tenn. 2014) (stating where a lender has a security interest in property and cash collateral, the majority of courts have held that the debtor must provide adequate protection for each interest).

34. As explained by the United States Bankruptcy Court for the Eastern District of New York, "courts recognize that Section 552(b) creates a security interest in post-petition rental income that is separate and distinct from the creditor's security interest in the property securing the mortgage." *In re South Side House, LLC*, 474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012) (citing *In re Gramercy Twins Assocs.*, 187 B.R. 112, 121 (Bankr. S.D.N.Y. 1995)).

35. While MidCap's security interests in its cash collateral is not a security interest in rents, the same rationale applies—pursuant to section 552(b) of the Bankruptcy Code, MidCap has a postpetition security interest in and lien on all cash proceeds of accounts receivable generated before the Petition Date. 11 U.S.C. § 552(b)(1).

36. That is, pursuant to section 552(b)(1) of the Bankruptcy Code, MidCap has a separate and distinct security interest in postpetition cash collateral generated as proceeds of prepetition accounts receivable, and the security interest granted pursuant to section 552(b)(1) of the Bankruptcy Code must be provided *separate* adequate protection. *See South Side House*, 474 B.R. at 408.

37. The Debtors' current proposal falls far short of adequately protecting each of MidCap's interests and, therefore, the Debtors' request for the use of cash collateral must be denied.

**(b). The proposed payments and replacement liens are inadequate.**

38. The adequate protection proposed for the use of MidCap's cash collateral—(a) payment to MidCap of twenty-five (25%) of MidCap's cash collateral; and (b) replacement liens on postpetition accounts receivable—is wholly inadequate.

39. When requiring a debtor to provide adequate protection, the focus is to protect the secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor. *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994)

("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.")

40. While precise equivalency is not required, "[t]he special treatment afforded cash collateral recognizes its unique status as the highest and best form of collateral." 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 363.05[3], at 363-42 (16th ed. 2012).

41. As a result, for the Debtors' proposal to adequately protect MidCap's interest in cash collateral, the aggregate amount of (a) the payments to be made to MidCap and (b) the Debtors' generation of postpetition cash collateral would need to be roughly equivalent to the Debtors' proposed use of MidCap's cash collateral—or, roughly equivalent to nearly Fifteen Million Dollars ($15,000,000) in the first thirteen weeks of this case.

42. Looking at only the first thirteen weeks of the Debtors' proposed budget, after giving consideration to the proposed payments to MidCap in the approximate amount of $3.6 million (Dkt. No. 8, at 104), the Debtors would need to generate postpetition accounts receivable in an amount sufficient to generate future cash collections in an amount roughly equivalent to $11.36 million.[6]

43. With the Debtors focusing on winding down operations, the generation of postpetition accounts receivable can be expected to be significantly outpaced by the amount of cash collateral being expended by the Debtors.

44. As the Debtors themselves have represented to this court:

> As the Wind Down progresses, the Debtors' business will be limited to, among other things, performing previously scheduled procedures and pursuing the collection of accounts receivable.

(Dkt. No. 10, ¶ 11.)

---

[6] The Debtors' historical collection rate is approximately 19.81% of gross accounts receivable—that is, for every $100 in accounts receivable generated, the Debtors have only managed to collect approximately $19.81.

45. And, the Debtors have asked this court to permit them to reject in excess of seventy-five (75) contracts with physicians providing services at the Debtors' hospital. (*See generally* Dkt. No. 10, Dkt No. 10, Exh. A; *see also* Dkt. No. 10, ¶ 16 ("The Debtors have reviewed the Contracts and have determined that in light of the Debtors' planned Wind Down, the Contracts are no longer necessary for or beneficial to the Debtors' estates."); Dkt. No. 7, ¶ 9 (stating the expectation is these physicians will transition away from the Debtors to other facilities).)

46. If the Debtors are winding down and transitioning at least seventy-five (75) physicians away to other facilities, it strains credulity to expect the Debtors would continue to generate postpetition accounts receivable at anywhere near the level accounts receivable were generated prepetition.

47. In fact, this appears to be played out in the Debtors' proposed budget, which shows anticipated cash receipts decrease from an anticipated high point of approximately $2.2 million in the third week of this case to only $315,718 during the thirteenth week of this case.

48. If the Debtors anticipated generated revenues at the same level they had prepetition, presumably the Debtors would project relatively constant cash receipts—but, instead, they project a nearly 86% decrease in cash collections from week three to week thirteen.

49. Based upon the foregoing, the Debtors' proposed adequate protection for MidCap's interests in cash collateral is wholly inadequate.

50. Therefore, the Debtors' request to use MidCap's cash collateral should be denied.

II. **The Debtors have failed to demonstrate MidCap will be adequately protected.**

51. The Debtors are proposing to use nearly Fifteen Million Dollars ($15,000,000) of MidCap's cash collateral in the first thirteen weeks of this case while proposing to (a) make

adequate protection payments in the approximate amount of $3.15 million and (b) grant replacement liens on postpetition accounts receivable in an unspecified amount.

52. The Debtors, however, have provided no evidence to MidCap or this court regarding the amount of postpetition accounts receivable the Debtors anticipate generating.

53. And, to the extent other collateral can serve to adequately protect MidCap's security interest in cash collateral (it cannot), the Debtors also assert, without evidence, that MidCap's interests in other collateral adequately protect MidCap.

54. Having provided absolutely *no* evidence or other information regarding the value of the adequate protection to be provided to MidCap, the Debtors seem unlikely to be able to carry their burden to demonstrate that the Debtors are adequately protecting MidCap for the use of nearly Fifteen Million Dollars ($15,000,000) of MidCap's cash collateral in the first thirteen weeks of this case.

55. Because MidCap does not consent to the use of its cash collateral, and because the Debtors will be unable to meet their burden of proving adequate protection, this Court cannot grant the Debtors' request to use MidCap's cash collateral.

*[Remainder of page intentionally left blank.]*

WHEREFORE, MidCap respectfully requests that this court deny the Motion insofar as it seeks authority to use MidCap's cash collateral and grant such other and further relief as this court deems just and proper.

Dated: February 2, 2017

Respectfully submitted,

**Drinker Biddle & Reath, LLP**

*/s/ Patrick A. Jackson*
Steven K. Kortanek (Del. Bar No. 3106)
Patrick A. Jackson (Del. Bar No. 4976)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone:  302.467.4200
Facsimile:  302.467.4201
Email:  steven.kortanek@dbr.com
            patrick.jackson@dbr.com

-and-

David E. Lemke
Katie G. Stenberg
Blake D. Roth
**Waller Lansden Dortch & Davis, LLP**
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone:     615.244.6380
Facsimile:     615.244.6804
Email:  david.lemke@wallerlaw.com
            katie.stenberg@wallerlaw.com
            blake.roth@wallerlaw.com

*Attorneys for MidCap Funding IV Trust*